UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

CHRISTOPHER MOONEY AND NICOLE : 
MOONEY, :
                                    Plaintiffs, :
                                                :
                      -against-                 :
                                                :
NEW YORK FERTILITY INSTITUTE, 1016 5TH :
AVENUE GYNECOLOGY, PC, MAJID FATEH, :
M.D. AND KHALID M. SULTAN, M.D., :
                                                :
                                    Defendants. :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___2/14/22___

20-CV-4345 (VEC)

MEMORANDUM
OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

Plaintiffs Nicole and Christopher Mooney sought fertility treatment at Defendant New

York Fertility Institute ("NYFI") over the course of four years, from April 2015 to March 2019.

The Mooneys allege that the Defendants committed medical malpractice while treating them.

*See* Am. Compl., Dkt. 16 ¶¶ 73(a)–(j).  More specifically, Plaintiffs point to two issues that arose

during the four years in which NYFI was providing fertility treatments to them: the alleged death

of one embryo pre-transfer, and the use of a so-called "special considerations" embryo instead of

an available healthy embryo in a different transfer.  Defendants have moved for summary

judgment, arguing that: (1) despite records to the contrary, no embryo actually died; (2) the

transfer of the special considerations embryo was not malpractice; and (3) all allegations on

which Plaintiffs' expert does not opine should be dismissed.  *See* Not. of Mot., Dkt. 42; Defs.

Mem., Dkt. 43 at 14–17, 18–19.  For the following reasons, Defendants' motion is GRANTED

in part and DENIED in part.

**BACKGROUND**

On April 10, 2015, Plaintiffs consulted with Dr. Majid Fateh at NYFI in pursuit of fertility treatment.  Defs. 56.1 Response Stmt., Dkt. 58 ¶ 9.  From that point until March 2019, Ms. Mooney underwent 13 egg retrievals and 15 embryo transfers.[1]  *Id.* ¶ 10.  Of those transfers, two are at issue in this case.

The first transfer that is at issue occurred on August 8, 2016, when NYFI purportedly transferred two embryos from "Cycle 6"[2] to Ms. Mooney, neither of which resulted in a pregnancy.  *Id.* ¶ 23.  According to certain NYFI records, one of those embryos was not transferred; the record reflected that it was "dead."  Radomisli Decl., Ex. E-2, Dkt. 50-2 at 67.  Elsewhere, NYFI's records indicate that two embryos were thawed but only one was transferred.  *Id.* at 68–69.  At the time of the transfer, however, Dr. Khalid Sultan orally told Plaintiffs that two embryos had been transferred, and he provided pictures of two embryos to Plaintiffs.  Defs. 56.1 Response Stmt. ¶ 24.  Defendants contend that the "dead" notation was simply a mistake in the records.  They assert that there is unassailable evidence, specifically, pictures of the embryos, pictures of the straws in which the embryos were held, Dr. Sultan's contemporaneous notes, and his deposition testimony, that two embryos were transferred.  Defs. Mem. at 3–4.

The second transfer at issue occurred on August 16, 2017.  Four embryos resulted from "Cycle 9".  Defs. 56.1 Response Stmt. ¶ 30.  During Preimplantation Genetic Screening ("PGS")

---

[1]     Some of the transfers were to Ms. Mooney; others were to "gestational carriers."  Defs. 56.1 Reply Stmt. ¶ 10.

[2]     A "cycle" in this context consists of egg retrieval from Ms. Mooney and subsequent fertilization.  That process results in the formation of embryos.  According to the evidence in this case, the quality of the embryos that develop during a cycle can vary widely.  The goal of treatment is to transfer one or more embryos that will result in a successful pregnancy.  Defs. Mem. at 2–3.

testing, one of the four Cycle 9 embryos was identified as a "special considerations" embryo,[3] one was a healthy female embryo, and two were healthy male embryos. On August 16, 2017, the special considerations embryo was transferred to a gestational carrier. *Id.* ¶ 80. Plaintiffs contend that (i) they were not informed that the special considerations embryo was transferred and (ii) they were not told that there was a remaining, healthy female embryo available from that cycle until March 11, 2019, or approximately two years later. *Id.* ¶ 81. Although the NYFI records reflected that a healthy embryo was transferred on August 16, 2017, Defendants contend (i) that the special considerations embryo was ranked the best for transfer and was transferred, and (ii) that the records that indicate a different embryo was transferred reflect a mistaken computer entry. Defs. Mem. at 5. Plaintiffs allege that this mix-up in the records led to the healthy female embryo being "lost" for a period of nearly two years before it was eventually used in March 2019. Pls. Opp., Dkt. 51 at 5, 20. Defendants argue the healthy female embryo was not transferred on August 16, 2017, because it was not the highest quality embryo available and that the healthy female embryo from Cycle 9 was never lost. Defs. Mem. at 15.

On June 8, 2020, Plaintiffs filed this lawsuit. *See* Compl., Dkt. 1. Upon the completion of discovery, Defendants filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Not. of Mot., Dkt. 56. The parties appeared for oral argument on February 8, 2022. *See* Dkt. 59.

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[3]      The term "special considerations" is used to describe an embryo that is less than ideal for transfer due to certain irregularities. Pls. Opp., Dkt. 51 at 4.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  To defeat summary judgment, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).  A party may not "rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [his] version of the events is not wholly fanciful."  *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).  Summary judgment cannot be defeated by the presentation of "but a 'scintilla of evidence' supporting [plaintiff's] claim."  *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

On a motion for summary judgment, courts "construe the facts in the light most favorable to the non-moving party and [] resolve all ambiguities and draw all reasonable inferences against the movant."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (internal citation and quotation marks omitted).  A district court is not, however, under any "obligation to engage in an exhaustive search of the record" when considering a motion for summary judgment.  *Jones v. Goord*, 435 F. Supp. 2d 221, 259 (S.D.N.Y. 2006) (citing *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470–71 (2d Cir. 2002)).

In medical malpractice cases under New York law, a defendant establishes *prima facie* entitlement to summary judgment by demonstrating that in treating the plaintiff there either was no departure from the standard of care or that any departure was not the proximate cause of the injuries alleged.  *Costa v. Columbia Presbyterian Med. Ctr.,* 105 A.D.3d 525, 525–26 (1st Dep't

2013) (collecting cases).  If the defendant presents evidence to satisfy that burden, to defeat

summary judgment the plaintiff need only raise a triable issue of fact to rebut the defendant's

*prima facie* showing.  *Stukas v. Streiter*, 83 A.D.3d 18, 25 (2d Dep't 2011).  To prevail in a

medical malpractice case in New York, a plaintiff must prove "(1) the standard of care in the

locality where the treatment occurred, (2) that the defendant breached that standard of care, and

(3) that the breach of the standard was the proximate cause of injury."  *Nichols v. Stamer*, 49

A.D.3d 832, 833 (2d Dep't 2008) (internal citation and quotation marks omitted).  Expert

testimony is required to establish deviation from the standard of care and proximate causation,

*id.,* unless proximate cause is within the ken of a lay juror, *Lyons v. McCauley*, 252 A.D.2d 516,

517 (2d Dep't 1998).

I.    **There Are Material Questions of Fact Regarding Both the August 8, 2016 and August 16, 2017 Embryo Transfers**

Defendants rely on the expert report of Dr. Hugh Taylor to argue that they have made a

*prima facie* showing that they did not depart from the standard of care in Plaintiffs' treatment or

that any departure was not the proximate cause of Plaintiffs' alleged injuries.  Defs. Mem. at 10–

11.  Dr. Taylor purports to render three opinions.  First, with respect to the use of a special

considerations embryo during the August 16, 2017 transfer, he opined that Defendants did not

depart from the standard of care with regard to labeling, maintaining, and storing the Mooneys'

embryos; the errors that existed were errors in numbering or charting, not errors in actually

labeling or maintaining the embryos.  Radomisli Decl., Ex. O, Dkt. 48-6 at 3–4.  He also opined

that the transfer of the special considerations embryo when there was a healthy embryo available

was not the proximate cause of any injury to Plaintiffs because the healthy embryo was

eventually transferred.  *Id.*  Significantly, he offers no opinion whether the standard of care

allows the transfer of a "special considerations" embryo if a healthy embryo is available.

5

Second, he opined that, with respect to the August 8, 2016 embryo transfer, despite Defendants'
records to the contrary, neither embryo died prior to transfer.  *Id.* at 4.  The basis for that aspect
of Dr. Taylor's opinion was not an evaluation of any objective evidence; instead, his opinion
simply regurgitates what Defendants said.  According to Dr. Taylor, because no embryo died
prior to transfer, there was no deviation from the standard of care and Plaintiffs suffered no
injury.  *Id.*  Finally, Dr. Taylor opined that Plaintiffs' expert, Dr. Zaher Merhi, assumed NYFI
did not follow proper protocols with respect to labeling embryos without identifying what proper
protocols would have been.  *Id.* at 4–5.  Defendants argue that, as to all claims, Dr. Merhi: fails
to establish a standard of care; does not opine on causation; and has based his report on incorrect
factual assumptions.  Defs. Mem. at 11–18.

   The Court finds that Defendants have failed to make a *prima facie* showing of entitlement
to summary judgment as to alleged deviations from the standard of care with respect to the
August 8, 2016 and August 16, 2017 embryo transfers, although the theories on which Plaintiffs
may proceed are not as broad as their papers suggest.[4]

### A. Defendants Are Not Entitled to Summary Judgment with Respect to Use of the Special Considerations Embryo

   Defendants assert that the special considerations embryo was the one with the best
morphology and was, therefore, the embryo that was transferred on August 16, 2017.  Defs.
Reply, Dkt. 57 at 7; Defs. Rule 56.1 Stmt., Dkt. 44 ¶¶ 53–54; Radomisli Decl., Ex. J, Dkt. 48-1
at 23–24.  Dr. Taylor's opinion is silent on whether the standard of care in the world of fertility
treatments is to transfer a special considerations embryo in lieu of a healthy embryo if its

---

[4]  Even if Defendants could establish a *prima facie* entitlement to summary judgment, the Court would find
that Plaintiffs have successfully rebutted that showing as to the specific theories on which Plaintiffs may proceed for
these two transfers.  *Stukas*, 83 A.D.3 at 25.

morphology is better.  Instead, Dr. Taylor's opinion focuses on the fact that NYFI's computer

records reflected incorrect information regarding which embryo was actually transferred on

August 16, 2017.[5]  Radomisli Decl., Ex. O at 3.

Dr. Merhi, in contrast, opined that the use of the special considerations embryo was a

deviation from the standard of care because common practice is to choose a healthy embryo if

one is available.  Radomisli Decl., Ex. L, Dkt. 48-3 at 2–3.[6]  Because Defendant has proffered no

expert testimony that transfer of the special considerations embryo comported with the standard

of care and Plaintiffs have an expert who opines it did not, *see id.*, Defendants have not

demonstrated a *prima facie* entitlement to summary judgment on this claim.

Defendants also argue that even if there were a departure from the standard of care, the

use of the special considerations embryo did not injure Plaintiffs.  Defendants argue that the

healthy embryo that was available but not used on August 16, 2017, was eventually transferred

in 2019, and, therefore, Plaintiff cannot prove that any deviation from the standard of care that

occurred resulted in injury.  Radomisli Decl., Ex. O at 3.  Plaintiffs assert that they were injured

because they suffered emotional distress when they eventually learned — two years and four egg

harvests later — that a healthy female embryo had been available for two years.  Pls. Opp. at 10.[7]

---

[5]    The issue of incorrectly charting which embryo was actually transferred was also addressed by Plaintiffs'
expert.  Radomisli Decl., Ex. L at 3–4.  Because Plaintiffs conceded at oral argument that the error in numbering
does not constitute a distinct claim for medical malpractice under their theory of the case, *see* Tr. at 41, 44, Feb. 8,
2022, the Court will not discuss it further.  *See also infra* at 10–11.

[6]    At oral argument Defendants disputed that Dr. Merhi actually opined that the standard of care was violated.
Tr. at 8, 27.  While the Court agrees that Dr. Merhi's report was not artfully worded, construing his report in the
light most favorable to the non-moving party, as the Court must at this stage of the case, it adequately opines that it
was a violation of the standard of care to transfer a special considerations embryo when a healthy embryo was
available.  Radomisli Decl., Ex. L at 2–3.

[7]    In their brief, Plaintiffs argue that the harm Ms. Mooney suffered included four additional egg retrievals, an
alleged injury not discussed by Dr. Merhi.  Pls. Opp. at 10; *see generally* Radomisli Decl., Ex. L, Dkt. 48-3.  At oral
argument, Plaintiffs conceded that the harm suffered was solely the delay in use of the healthy embryo and
emotional distress allegedly suffered upon learning of its non-use, and not the physical harm of enduring additional

Moreover, although it requires a certain amount of reading between the lines, one can infer from Dr. Merhi's report that Plaintiffs were proximately harmed by Defendants' use of the special considerations embryo in lieu of the available healthy embryo because it reduced their changes of achieving a pregnancy from that transfer.  Radomisli Decl., Ex. L at 3–4; Tr. at 40, Feb. 8, 2022.  Although Dr. Merhi does not opine on the cause of the Mooneys' emotional distress, expert testimony is not necessary if "the matter is one which is within the experience and observation of the ordinary juror."  *Lyons*, 252 A.D.2d at 517 (citation omitted).  Emotional distress surely qualifies.  *Cf. Rance v. Jefferson Vill. Condo. No. 5*, No. 18-CV-6923, 2019 WL 12373336, at *2 (S.D.N.Y. Sept. 23, 2019) (noting that evidence of "garden variety" emotional distress claims in the Second Circuit "is generally limited to the testimony of the plaintiff" and typically does not involve "any medical corroboration") (citation omitted).

Because there are questions of fact whether Defendants adhered to the standard of care with respect to the August 16, 2017 transfer and whether any departure from the standard of care was the proximate cause of Plaintiffs' injuries, Defendants' motion is denied with respect to the events surrounding that transfer.  Plaintiffs may proceed to trial on the theories (i) that Defendants' transfer of the special considerations embryo deviated from the standard of care resulting in a reduced chance of achieving pregnancy from that transfer,[8] and (ii) that Defendants' failure to inform Plaintiffs that an available healthy female  embryo was not transferred at that time resulted in emotional distress when they eventually learned that fact.

---

egg retrievals. Tr. at 34–35, 38, 40–41.  The additional egg retrievals may, nonetheless, serve as corroborating evidence that Plaintiffs were not informed of the existence of the remaining healthy female embryo from Cycle 9.

[8]       The Court notes that this is a very close call.  While Dr. Merhi opines that the standard of care is to transfer a healthy euploid embryo over a special considerations embryo, he does not articulate why.  Radomisli Decl., Ex. L at 3–4.  Because, however, it is obvious that the entire point of fertility treatments is to get a successful pregnancy, the Court infers that the standard of care is to choose the healthy euploid embryo over a special considerations embryo because it is more likely to result in a successful pregnancy, and that therefore the injury suffered would be the lowered chance of success.  Dr. Merhi could certainly have made that clearer, however.

### B. Defendants Are Not Entitled to Summary Judgment with Respect to the Allegedly Dead Embryo

With respect to the August 8, 2016, embryo transfer, there is clearly a question of fact whether an embryo died after being thawed and before being transferred.  Plaintiffs argue that Dr. Taylor has implicitly conceded that failure to inform the patient of the death of an embryo prior to transfer is a deviation from the standard of care.  Pls. Opp. at 9–10.  If, as a matter of fact, no embryo died, then Dr. Taylor's assertion that there was no deviation from the standard of care establishes a *prima facie* entitlement to summary judgment.  If an embryo died, however, Defendants have not established *prima facie* entitlement because they have not addressed the standard of care to be followed when an embryo dies under these circumstances.  In contrast, Dr. Merhi opines that the standard of care is to correctly inform the patients that an embryo has died prior to transfer and to consult on whether to thaw another embryo so two could be transferred. Radomisli Decl., Ex. L at 5–6.

It is undisputed that, according to NYFI's records, one embryo in that transfer was marked "dead."  Radomisli Decl., Ex. E-2, Dkt. 50-2 at 67–69.  Defendants assert that notation was a failure of record-keeping and not what actually occurred.  Defs. Mem. at 3–4. Defendants point to pictures of the two embryos, pictures of the straws from which the embryos were retrieved, contemporaneous notes from Dr. Sultan, and Dr. Sultan's deposition testimony as proof that two live embryos were transferred.  *Id.* at 16–17.  Plaintiffs argue that there is a question of fact (i) because "the pictures only depict the embryos themselves at some point prior to the transfer," not during or after the transfer, and (ii) because there is a conflict within Defendants' contemporaneous records.  Pls. Opp. at 16.

While a jury could easily be persuaded by Defendants' explanation of the inconsistency in their own records, Plaintiffs are correct that there clearly is a question of fact whether both

9

embryos survived thawing and until the time of transfer.  Plaintiffs offer evidence that is more

than conclusory that an embryo died — namely, the NYFI's own records.  *D'Amico*, 132 F.3d at

149.

Although there is clearly a question of fact for the jury whether an embryo died and

whether failure to inform Plaintiffs of that death would have been a deviation from the standard

of care, in order to survive summary judgment, Plaintiffs must have evidence that Defendants'

deviation from the standard of care was the proximate cause of harm to Plaintiffs.  At oral

argument, Plaintiffs asserted that the harm caused was (i) emotional distress when they later

learned that an embryo had died prior to transfer and (ii) the lost opportunity to decide what to do

in light of the embryo's death (such as whether to thaw another embryo for that transfer).  Tr. at

32–34, 43.  While Dr. Merhi clearly opines that failure to inform patients of the status of the

dead embryo was a deviation from the standard of care, *see* Radomisli Decl., Ex. L at 5–6, the

only harm the Court can infer from his report would be the failure to substitute a live embryo for

the dead one at the time of transfer.  *Id.* at 5.  As noted above, however, Plaintiffs do not need

expert testimony to prove that Defendants' failure to inform them of the relevant facts caused

emotional distress when they eventually learned those facts.  *Lyons*, 252 A.D.2d at 517.

Because there is a question of fact regarding whether the embryo survived until transfer,

Defendants' motion is also denied as to the events surrounding the August 8, 2016 transfer.

Plaintiffs may only proceed on the theory that, if the embryo died, the failure to inform Plaintiffs

of that fact caused emotional distress.[9]

---

[9]     It is conceivable that Plaintiffs could have advanced the argument that Defendants' failure to thaw and
transfer an additional embryo to replace the one that died reduced the chance of that transfer resulting in a successful
pregnancy (because only one embryo rather than two were transferred).  Because Dr. Mehri's report does not
support that theory and because it is well beyond a lay juror's ken, Plaintiffs are limited to emotional distress
damages.

### C.  Plaintiffs Cannot Proceed on a Stand-Alone Record-Keeping Claim

Finally, Dr. Taylor opines that there is no basis for Dr. Mehri's assertion that there were uncertainties in embryo labeling that constitute a deviation from the standard of care.  Radomisli Decl., Ex. O at 4–5.  At oral argument, Plaintiffs effectively conceded that they are not pursuing failure to maintain accurate records as a stand-alone claim of medical malpractice but rather as evidence of the other forms of alleged malpractice they assert.  Tr. at 41, 44.  As a result, Defendants' motion is granted as to Plaintiffs' claim that Defendants committed malpractice by failing to adhere to the standard of care with respect to record-keeping.  The discrepancies in record-keeping may, however, be admissible at trial.

## II.    Plaintiffs' Allegations Not Addressed by the Expert Report Are Dismissed

In addition to contesting the validity of Dr. Mehri's expert report, Defendants argue that, because Dr. Mehri did not opine on several other Plaintiffs' allegations, Defendants are entitled to summary judgment on those claims.  Defs. Mem. at 19.  As previously noted, expert testimony is required for a plaintiff to establish a deviation from the standard of care.  *Nichols*, 49 A.D.3d at 833 (citation omitted).  Dr. Mehri's report does not discuss the standard of care implicated by the following allegations in the Amended Complaint: the failure to prescribe appropriate medications or treatments; the failure to conduct PGS testing on Ms. Mooney; negligently prescribing excessive doses of medication; and negligently caring for patients leading to poor success/performance rates (which is not alleged in the Amended Complaint in the first place). *See* Am. Compl. ¶¶ 73(b), (h).  Therefore, Defendants' motion is granted as to those claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion is granted in part and denied in part.  The Clerk of Court is respectfully directed to close the open motion at Docket 42.

The parties must adhere to the following pretrial schedule: motions *in limine* are due March 11, 2022; responses are due March 25, 2022; and the parties' Joint Pre-Trial order, with pre-marked exhibits, is due April 1, 2022.  The parties are ordered to file a joint letter not later than **February 21, 2022** informing the Court (1) whether they would like to be referred to the Magistrate Judge for a settlement conference and (2) whether there are any dates in Q3 as to which one or both parties are unavailable for trial.


**SO ORDERED.**

Date:  **February 14, 2022**　　　　　　　　　　　　　**VALERIE CAPRONI**
　　　　**New York, NY**　　　　　　　　　　　　　　**United States District Judge**

12